441 S.E.2d 363

**James SNIDER, Plaintiff
Below, Appellee,**

v.

**WEST VIRGINIA DEPARTMENT
OF COMMERCE, Defendant
Below, Appellant.**

**No. 21696.**

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 11, 1994.

Decided Feb. 17, 1994.

R. Vance Golden, III, Parkersburg, for appellee.

Darrell V. McGraw, Jr., Atty. Gen., William H. Hill, III, Asst. Atty. Gen., Charleston, for appellant.

PER CURIAM:

This dispute concerns the civil service pay rate of James Snider, an employee of the West Virginia Department of Commerce (hereinafter the Department) at Blennerhassett Historical Park (hereinafter the Park). Effective July 1, 1989, Mr. Snider, an unclassified employee of the Park's Commission with an annual salary of $24,816.00, was transferred to the Department as Building Maintenance Supervisor II, a classified position with an annual salary of $17,316.00. Mr. Snider argues that his transfer to classified service should not drastically reduce his salary because *W.Va.Code* 29–8–2 [1990], the transfer statute, provides that a transferred employee shall not be "severed, removed or terminated from such employment prior to his entry into the classified service...." The Department maintains that *W.Va.Code* 29–8–2 [1990] does not require that a transferred employee be paid the same salary that the Park paid before its transfer to the Department and that Mr. Snider's annual salary of $17,316.00 is comparable to similar positions in the Department's Division of Tourism and Parks. Because we find that the diminution of Mr. Snider's salary as a result of his transfer is so great that it constitutes a termination of employment prohibited by *W.Va.Code* 29–8–2 [1990], we affirm the decision of the circuit court.

On March 15, 1980, Mr. Snider was hired as Director of Operations by the Blennerhassett Park Commission (hereinafter the Commission). In 1980 Mr. Snider was an unclassified state employee with an annual salary of approximately $19,400.00. The Commission, an independent state agency, was established by *W.Va.Code* 29–8–1 [1975] *et seq.* to develop Blennerhassett island. In 1989, *W.Va. Code* 29–8–1 [1989] *et seq.*, was amended to make the Commission advisory and the Commission's employees were transferred to the Department of Commerce.

Currently, the Park consists of: (1) a building in the City of Parkersburg containing a museum, theater, administrative offices and storage space; (2) a five-hundred acre island in the Ohio River about two miles from the City containing a restored mansion, several buildings and various public recreational facilities; and (3) a docking facility and storage yard for the ferry boats used to access the island. A separate public dock near the confluence of the Little Kanawha and Ohio Rivers is used to access the island. The Park employs 10 full-time workers, as many as 16 additional part-time seasonal workers and 50 seasonal volunteers.

Under the Commission, Mr. Snider supervised and performed the Park's maintenance, assisted in the Park's development and construction, maintained and repaired the ferry boats, piloted the ferry boats, and trained other employees. Mr. Snider testified that substantial skill and experience was necessary to maintain and operate the ferries and that approximately half of his time is devoted to operating and maintaining the ferries. Mr. Snider also testified that at various times he supervised at least nine other workers. In its brief, the Department alleges that Mr. Snider does not supervise any other workers. During the summer tourist season, Mr. Snider testified he works between 40 to 70 hours per week. During the off-season, the emphasis of Mr. Snider's work shifts to maintenance and construction. Except for the removal of the Park's planning and construction to the Department's central office, Mr.

Snider's job after his transfer remains unchanged.

Effective July 1, 1989, the Commission's employees were transferred from unclassified to classified state employees. *W.Va. Code* 29–8–2 [1990].[1] By letter dated July 6, 1989, the Division of Personnel (hereinafter Personnel) recommended that Mr. Snider be classified as Building Maintenance Supervisor II with an annual salary of $24,816.00, which included the July 1, 1989 state workers' pay raise. However, the Department declined to adopt Personnel's salary recommendation and proposed to pay Mr. Snider an annual salary of $17,316.00.[2] Objecting to the reduction in his salary, Mr. Snider filed a grievance that was eventually heard by the West Virginia Education and State Employees Grievance Board (hereinafter the Board). The Board found that after the probationary period, Building Maintenance Supervisor IIs' salaries statewide range from $15,576 to $30,660 with an average salary of $19,650.[3] In contrast, the Department's salary range for Building Maintenance Supervisor IIs is from $15,576 to $19,920 with an average salary of $17,802.[4]

Mr. Snider maintains that his duties are unique because he must pilot and maintain the island's access boats. However, the Department asserts that the needs of the various state parks determine the responsibilities of the employees classified by the Department as a Building Maintenance Supervisor

1. The 1990 amendments to *W.Va.Code* 29–8–2 did not alter the employee transfer provisions.

2. The Department originally classified Mr. Snider as a Building Maintenance Supervisor I with an annual salary of $14,500. However based on the West Virginia Education and State Employees Grievance Board's decision of May 31, 1990, Mr. Snider was classified as Building Maintenance Supervisor II with an annual salary of $17,316.00 effective July 1, 1989.

    Apparently, in October 1993 as a result of a state-wide reclassification program, Mr. Snider was reclassified as a Building Maintenance Supervisor I. In oral argument, the parties indicated that Mr. Snider intends to protest this reclassification.

3. Different exhibits specify slightly different salaries for a Building Maintenance Supervisor II. Lowell D. Basford, Assistant Director of Personnel, testified that salaries varied because of periodic adjustment reflecting the actual salaries.

4. The Department employs 6 other employees classified as Building Maintenance Supervisor II. Employee 1 has two years service, supervises three full-time employees and is paid $16,212. Employee 2 has fourteen years service, supervises five full-time employees and is paid $19,920. Employee 3 has less than one year service and twenty-five years experience outside the park, supervises twenty-four full-time employees and is paid $19,848. Employee 4 has nine years service, supervises five full-time employees and is paid $16,932. Except for salary and a 1990 employment date, no additional information is available on Employee 5, who is paid $15,576 and Employee 6, who is paid $18,324.

II and that these responsibilities, although not identical, are similar.[5]

After the Board decided that Mr. Snider's position should be classified as a Building Maintenance Supervisor II with an annual salary of $17,316, Mr. Snider appealed to the circuit court. The circuit court found "no authority, statutory or otherwise, for reduction in salary for classified state employees" and restored his salary with appropriate back pay.[6] Alleging that Mr. Snider's reduction in salary occurred before he became a classified employee, the Department appealed to this Court.

I

In 1989, the Legislature transferred the Commission's employees to the Department by amending *W.Va.Code* 29-8-2 [1990] to provide, in pertinent part:

All employee positions in the former Blennerhassett historical park commission are hereby transferred to the division of commerce and shall be included in the classified service of the civil service system pursuant to article six [§ 29-6-1 et seq.], chapter twenty-nine of this code. Any person included in the classified service by the provisions of this section who is employed in any of such positions as of the effective date of this amendment [Acts 1989, c. 20: July 1, 1989; Acts 1990, c. 33: June 7, 1990] and reenactment shall not be required to take and pass qualifying or competitive examinations upon or as a condition to being added to the classified service: Provided, *That no person included in the classified service by the provisions of this section who is employed in any of such positions as of the effective date of this section* [Acts 1975, c. 112, March 7, 1975; Acts 1989, c. 20, July 1, 1989; Acts 1990, c. 33: June 7, 1990], *shall be thereafter severed, removed or terminated from such employment prior to his entry into the classified service* except for cause as if such person had been in the classified service when severed, removed or terminated. (Emphasis added.)

According to the statute, the Commission's employees should be transferred to the Department and except for cause, should not be "severed, removed or terminated." However, *W.Va.Code* 29-8-2 [1990] does not provide a clear directive concerning the transferred employees' salaries. "A statute that is ambiguous must be construed before it can be applied." Syllabus Point 1, *Farley v. Buckalew*, 186 W.Va. 693, 414 S.E.2d 454 (1992). As we stated in Syllabus Point 2, *Farley, id.*:

"The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syllabus Point 1, *Smith v. State Workmen's Compensation Commission*, 159 W.Va. 108, 219 S.E.2d 361 (1975).

Although there is a paucity of legislative history available to assist in statutory interpretation, Lowell D. Basford, Assistant Director of the Division of Personnel, provided some insight into the meaning of *W.Va.Code*

---

**5.** The Department's Building Maintenance Supervisor IIs are currently employed in the following parks: (1) Pipestem Resort State Park, consisting of 4,023 acres, includes a 113-room lodge, conference facilities, restaurant, indoor and outdoor pool, 30-room lower lodge, 25 deluxe cabins, 4 residences, golf course, golf course building and pro-shop, park office building, sewer and water distribution systems, maintenance shop, recreation building, stable, campground, and visitors' center; (2) Babcock State Park, consisting of 4,127 acres, includes a maintenance building, stable, trails, picnic shelters, toilet facilities, boat rental building, 19 acre lake and dam, sewer and water distribution systems and 2 sewer plants; (3) Canaan Valley Resort State Park, consisting of 6,015 acres, includes a maintenance building, a 250-room lodge, pool, tennis courts, 15 cabins, 34 camp sites, trails, golf course and building, and 6 residences; (4) Hawks Nest State Park, consisting of 243 acres, includes a 31-room lodge, conference rooms, restaurant, tramway, marina, gift shop overlook, sewage treatment plant, museum, picnic shelters, toilet facilities, trails, and boat launch; and (5) Blennerhassett Historical State Park, consisting of 500 acres, includes a museum, theater, office and storage area in one building as well as restored mansion, toilet facilities, one cabin, picnic shelters, several other buildings, two boats and dock facilities.

**6.** In the proceedings below, in addition to seeking to maintain his annual salary, Mr. Snider contended that the unique nature of his position required the creation of a new job classification. However, Mr. Snider's appeal to the Court only raised the question of his annual salary.

29–8–2 [1990]. Mr. Basford testified that, at the request of George E. Farley, the Chairman of the Finance Committee in 1989, he proposed the transfer statute's language that was eventually adopted by the Legislature. At the same time, pursuant to Mr. Farley's request for salary information for the budget bill, Mr. Basford prepared a tentative salary schedule for the transferred employees, indicating the transferred employees would retain their salaries. Mr. Basford acknowledged that he represented to Mr. Farley that under the proposed legislation the transferred employees' new salaries would be "either the same or above their old salaries." [7]

■ In *M'Culloch v. Maryland*, 4 Wheat. 316, 327, 17 U.S. 316, 327, 4 L.Ed. 579, 582 (1819), Chief Justice John Marshall stated, "An unlimited power to tax involves, necessarily, a power to destroy; because there is a limit beyond which no institution and no property can bear taxation." In this case, the Department maintains that the lower classified salary is consistent with other similar positions within its Department. However, by drastically reducing Mr. Snider's salary, the Department in effect gave Mr. Snider a Hobson's choice either to take the reduced salary or to find a new job. The Legislature in the transfer statute foreclosed the Department from severing, removing or terminating the transferred employees.

We find that the Department does not have unlimited power to change to transferred position because pursuant to *W.Va. Code* 29–8–2 [1990], the Department is foreclosed from severing, removing or terminating the transferred employees "except for cause as if such person had been in the classified service." In this case, Mr. Snider was transferred but his salary was decreased by 30% without a corresponding 30% job reduction. We find that Mr. Snider's reduction in pay was so great that it constitutes a termination of his employment, which is prohibited by *W.Va.Code* 29–8–2 [1990]. Although in this case, we find a 30% decrease in salary to be a constructive firing, in other cases, a smaller salary reduction in order to align the transferee's salary with an existing salary schedule may be considered *de minimis*, especially considering the greater job

7. Mr. Basford's testimony is as follows:

Basford.... But, anyway, the nature of the request was that they wanted to place the park within the state park system. They wanted to place the employees into the classified service. He requested that I give him, on a moment's notice I might add, the language necessary to place employees under the classified service and further to assure that they would not have to take any kind of qualifying or competitive examinations in order to become covered. So my memo .., I gave it verbatim and I think it appeared in the bill just as we had recommended. I also .., during the conversation, he said, "I also need ..," in addition to the budget document, there is what's called a legislative digest and it is a document that accompanies a budget bill and it gives a further breakdown of how the dollars are to be spent and I believe, included in that, there is an actual listing of job titles and that sort of thing and what their pay rate would be. So he asked me, "can you give me an approximate similar title that we can use to put in the budget bill? We don't want to use their current ..," because it had to be a title from the classified service. So, just based .., I said, "well, I don't know what these people do." And so he explained to me in the conversation what he thought their role was and he gave me their existing titles and he gave me their current salaries. So, from that, I tried to come up with a title that would be used simply for that purpose to put into that budget digest. I purposefully did not include a heading on the page which said, "position classifications, proposed allocations." I purposefully left that off because I did not want it to be .., not having position description forms, I wanted to be sure that it was not taken as the official allocation for those positions. It was for a very limited purpose.
Q. I understand. And your response to him then was you suggested this language to him to place in the bill, did you not?
Basford. That's correct.
Q. And it is my recollection that that is in fact at least part of the language that does in fact appear in the bill?
Basford. I believe that's correct, yes.
Q. Okay. And you also represented to him that these employees with this legislation would not have .., all their new salaries are either the same or above their old salaries, are they not?
Basford. That's correct.
Q. Now did Mr. Farley ever question you specifically in regards to how salaries would be handled?
Basford. I don't recall that being part of .., it may have but I just don't recall at that point.
. . .
Q. I said there's nothing in this letter that indicates to him that the salaries are to be cut if the bill is passed.
Basford. I believe .., yes, that's correct.

security, employment opportunities and other benefits offered by classified service. Because Mr. Snider's salary is mandated by a specific, narrow transfer statute, his salary does not establish and cannot be used as a benchmark for other Department employees who seek salary adjustments.

Although the Department argues that allowing Mr. Snider to retain his salary will substantially increase the Department's payroll, we find that this argument fails to consider the limited scope of this opinion. First, we note that *W.Va.Code* 29–8–2 [1990], affects only the employees transferred from the Commission to the Department—the record indicates only 10 persons were employed by the Commission. Second, pursuant to the Legislature's directive in *W.Va.Code* 29–8–2 [1990], a transferred employee's salary, even if higher than other Department salaries, cannot be the sole justification for increasing a non-transferred employee's salary. Finally, we note that the classified service system is in the process of a major review which should eliminate any lingering job classification questions.

"A final order of the hearing examiner for the West Virginia Educational Employees Grievance Board, made pursuant to W.Va. Code, 18–29–1, *et seq.* (1985), and based upon findings of fact should not be reversed unless clearly wrong." Syllabus Point 1, *Randolph County Bd. of Ed. v. Scalia,* 182 W.Va. 289, 387 S.E.2d 524 (1989). Based on the language of *W.Va.Code* 29–8–2 [1990], we find Board's hearing examiner was clearly wrong and that the circuit court correctly reversed the Board's decision.

For the above stated reasons, the judgment of the Circuit Court of Wood County is affirmed.

Affirmed.